IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIFFANY WILLIAMS | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-0652 |
| | ) | |
| v. | ) | |
| | ) | Judge Cercone |
| JO ANNE B. BARNHART, | ) | Magistrate Judge Lenihan |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY | ) | |
| | ) | Re: Doc. Nos. 11 & 13 |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

I.   RECOMMENDATION

      It is recommended that Plaintiff's Motion for Summary Judgment at Doc. No. 11 be granted and that the case be remanded to the Commissioner for further proceedings as described in this Report and Recommendation.  It is also recommended that the Defendant's Motion for Summary Judgment at Doc. No. 13 be denied.

II.   REPORT

      This is an action timely filed under the Social Security Act, 42 U.S.C. § 405 (g), to review a final decision of the Commissioner of Social Security, finding that although Plaintiff, Tiffany Williams, has the severe impairments of drug addiction, borderline personality disorder, a left ankle injury, and optic neuritis (Tr. 15, Finding No. 2), "[t]he impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4," (Tr. 17, Finding No. 3), and she can perform work at any exertional level and is able to perform all of

her past relevant work.  (Tr. 18, Finding Nos. 5-6.)  Plaintiff seeks Supplemental Security Income ("SSI") benefits pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83.  She has not engaged in substantial gainful activity since the date of filing, January 14, 2004.  (Tr. 14, 17, Finding No. 1.)

    A.    <u>Relevant Facts</u>

        1.    <u>Relevant medical evidence of record</u>

On January 5, 2004, Plaintiff presented to the Allegheny General Hospital emergency department requesting a pelvic exam and urine drug screening.  (Tr. 98.)  The records reflect that Plaintiff has a history of body packing, that is, stuffing her vagina with cocaine.  Plaintiff indicated that "she would like to be checked to make sure that there is no retained package of cocaine in her vagina and also to have a repeat urine drug screen."  (Tr. 98.)  "The vaginal vault was explored.  No evidence of foreign material found."  (Tr. 99.)  The urine drug screen was also negative.  Plaintiff was discharged to follow up with her treatment program in drug rehabilitation, and she was directed to return should she experience chest pain, shortness of breath, palpitations, or other concerns prior to follow up visit.  (Tr. 99-100.)

January 13, 2004 medical records from Western Psychiatric Institute and Clinic, Hill Satellite Center, reflect reports generated by Dominic Gomes, and James Thompson, both co-signed by Robert Marin, M.D.  Plaintiff's complaints included depression for 10 hours per day, and anxiety for 15 hours per day.[1]  On a scale of 1 to 10, with 10 being the highest or worst,

---

[1] Portions of these documents have been redacted and no complete versions have been provided in the record.  Further, these documents appear to reflect information relating only to Plaintiff, and not to others at the Hill Satellite Center.

2

she rated her depression at a 7, and her anxiety at an 8.  She also reported that she experiences mood swings all day and that she does not like to be around people.  (Tr. 87-93.)  She described an eight year history of prostitution.  Her mental status examination revealed that Plaintiff was easily engaged, friendly and cooperative.  She displayed full range of affect and stable mood.  Her rate and pattern of speech and thought were within normal limits; content of speech and thought were coherent.  She denied any psychotic symptoms although she has some memory loss due to drug use.  Plaintiff was diagnosed with depressive disorder, NOS, started on Effexor, and assigned a global assessment of functioning of 55.[2]   (Tr. 87-93.)

On January 12, 2004, Plaintiff was examined by Anthony Watson, M.D. on referral from Allegheny General Hospital regarding a complaint of left ankle pain.  (Tr. 103.)  Dr. Watson noted that Plaintiff had tenderness over the anterolateral ankle and sinus tarsus area.  He noted no swelling, redness or warmth, no deformity on sitting or standing, and reciprocal heel-toe gait without limp.  Dr. Watson indicated that an MRI would allow him to better evaluate Plaintiff's complaints.  In response to her inquiry about Vicodin, Watson informed Plaintiff that he would not be treating this pain with narcotics.  She indicated that Motrin upsets her stomach

---

[2]A Global Assessment of Functioning (GAF) score is used to report an individual's overall level of functioning with respect only to psychological, social, and occupational functioning.  A "GAF rating is within a particular decile if **either** the symptom severity **or** the level of functioning falls within the range."  A GAF score of between 51 and 60 indicates:

> **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers).

Diagnostic and Statictical Manual of Mental Disorders ("DSM-IV-TR") PP. 32-34 (American Psychiatric Association, Task Force on DSM-IV (4th ed. (Text Revised) 2000) (emphasis in original).

and Watson indicated that he would start her on Ultram. (Tr. 103.) On February 2, 2004, Watson again saw Plaintiff after her MRI, which demonstrated a type II osteochondral lesion of the medial dome of the talus. She had a "number of questions regarding pain pill management of her pain." (Tr. 102.) Dr. Watson recommended ankle arthroscopy with debridement of a possible chondral flap. He anticipated a 50/50 chance of improvement after ankle arthroscopy. Plaintiff did not wish to pursue surgery at that time and Dr. Watson advised her to follow up with her primary care physician for pain management. (Tr. 102.)

On January 20, 2004, progress notes from Allegheny General Hospital reflect Plaintiff's concerns regarding varicose veins and a request for hepatitis B and TB shots. Plaintiff described her past work as a home health aid and coming into contact with blood products. A hepatitis B series was begun. Plaintiff also received a tetanus shot. (Tr. 95-97.)

On November 12, 2004, Plaintiff again reported severe depression, anxiety and insomnia. She also reported that her husband had terminal cancer. She was tearful and indicated that she lacks energy and spends the majority of her time at home in bed. (Tr. 145.) Dr. Kenneth Thompson diagnosed Depression NOS. He noted her history of crack addiction and that she has been clean for one year. (Tr. 146.) Plaintiff reported the same complaints on February 14, 2005, although Dr. Thompson indicated that mood was improved and Plaintiff was clinically stable. He noted that she "remains clean." (Tr. 140-42.)

Psychologist Lawrence B. Haddad, Ph.D. evaluated claimant on April 16, 2004. (Tr. 104-109.) Dr. Haddad noted that Plaintiff related to him in a somewhat distant, perhaps indifferent manner. Plaintiff indicated to him that she is unable to work because she cannot get up in the morning and because of pain in her left ankle. He noted that she is taking

antidepressants and Darvocet for pain. She also complained of anxiety. She described her history of crack cocaine use and that she had not been "using" for five months. He noted that Plaintiff appeared subdued and described some symptoms associated with mild depression. On mental status examination, Dr. Haddad noted no significant anxieties, indicating that Plaintiff looked apathetic and indifferent. She related in a subdued manner and Haddad indicated some psychomotor slowing. He noted no unusual or bizarre behavior and he questioned her cooperation with the exam in light of her indifference. She described a sleep disturbance and showed some dysphoria with regard to mood. Affective expressions were quite restricted in range and intensity, but were appropriate to content and situation. He noted no signs of psychotic-like disturbances, and Plaintiff denied any auditory or visual hallucinations. She admitted to fleeting suicidal thoughts. He indicated that he believed Plaintiff is capable of low average intellectual abilities with mild impairments to concentration and attention. He diagnosed Plaintiff with a dysthymic disorder which he described as a mild, long term depression, manifested by marked apathy, indifference, dysphoric mood, some psychomotor slowing, very fleeting suicidal thoughts, sleep disturbances and low energy level. He also offered the diagnosis of borderline personality disorder due to patterns of unstable and intense interpersonal relationship problems. Dr. Haddad also noted a history of some problems with impulsivity, dysphoria, and descriptions of anxiety that last for a few hours or a day. Under Psychiatric Activities Assessment, Dr. Haddad indicated that Plaintiff is a socially immature individual, but she could probably interact appropriately with persons in authority, as well as co-workers and peers, but would have difficulty with the public. He noted her chronic fatigue problem with mild to moderate concentration and attention problems, but opined that she could

carry out simple instructions, perform simple nonstressful activities, attend to tasks from beginning to end, and sustain a routine. Under Medical Source Statements of Ability to do Work-Related Activities, Dr. Haddad rated Plaintiff as having no impairments or slight impairments in all categories except "carry out detailed instructions," "interact appropriately with the public," and "respond appropriately to work pressures in the usual work setting," wherein he rated her with moderate impairments. (Tr. 104-109.)

   Likewise, Sharon Becker Tarter, Ph.D., in a Psychiatric Review Technique form, concluded that Plaintiff had mild limitations in activities of daily living and moderate limitations in social functioning and in concentration, persistence or pace. She found no episodes of deterioration or decompensation. (Tr. 110-24.) She also found that Plaintiff would be capable of completing a normal work week without exacerbation of psychological symptoms and would be able to perform repetitive work activities without constant supervision and would be able to meet the basic mental demands of competitive work on a sustained basis. (Tr. 125.)

   On December 3, 2004, Dr. Alan Klein performed outpatient arthroscopic surgery on Plaintiff's left ankle. Plaintiff tolerated the surgery well. Plaintiff was to remain non weight bearing for six weeks. (Tr. 136-39.)

   A February 14, 2005 Medication Management check by Dr. Thompson reflects that Plaintiff's mood is improved, sleep is O.K., and she "remains clean." (Tr. 140-42.) He noted that she is "still sad, but managing with reactive affect." (Tr. 141.) Thompson also reported no suicidal/homicidal ideation, and no psychosis. (Tr. 141.)

   On March 1, 2005, Plaintiff was admitted to UPMC Presbyterian Shadyside Hospital Emergency for complaints of left eye blurred vision lasting 3-4 days prior to admission.

(Tr. 148-49.)  Plaintiff was diagnosed with optic neuritis.  (Tr. 152.)  Thereafter, on April 4, 2005, a neurology work up revealed demyelination on her MRI consistent with multiple sclerosis.  Plaintiff indicated that her vision had improved and that she had some mild tingling and numbness of the toes.  She denied any previous exacerbations, weakness, problems with gait, seizures, or problems with anxiety or mood.  (Tr. 154.)  March 28, 2005, and April 25, 2005 visits to UPMC Department of Ophthalmology indicated that Plaintiff's vision was improving.  (Tr. 156-167.)

    Notes from a Medication Management check performed by Dr. Thompson on May 20, 2005 reflect that Plaintiff was hospitalized for eye inflammation due to multiple sclerosis.  Thompson also noted that Plaintiff went on vacation, had a good time, and is getting along with her husband.  Plaintiff requested more clonazepam indicating that it helps her relax.  Mental Status Findings indicate euthymic with congruent mood, with no suicidal/homicidal ideation and no psychosis.  His assessment indicated Plaintiff was clinically stable, "but has some increase in anxiety with me."  (Tr. 175.)  Again, diagnosis was Depressive Disorder NOS.  (Tr. 175.)  An Individual Therapy Progress note generated by Yvonne Reed, also on May 20, 2005, indicates Plaintiff's complaints of lack of energy and spending the majority of her time at home in bed.  Reed also indicates, however, that Plaintiff "was engaged, and seemed happy today as she recounted her exploits on a recent family vacation."  (Tr. 177.)  Reed also indicated that Plaintiff was "depressed, but with the help of close family members she seems able to engage in some social activities keeping her from being isolated and sad."  (Tr. 177.)

    Finally, on September 21, 2005, a Medication Management report generated by Dr. Robert Marin reflects that Plaintiff's husband died on August 18, 2005, and she complains of

increased anxiety. Dr. Marin's Mental Status Findings indicate that Plaintiff was pleasant and cooperative, mood was depressed, affect was congruent and reactive. He also indicates that she is experiencing no delusions, nor suicidal or homicidal ideation. Diagnosis indicated Major Depressive Disorder, recurrent, moderate; and cocaine dependence in sustained full remission. He continued her previously prescribed Wellbutrin to target anxiety and depression, Trazadone for sleep, and increased her Klonopin during this time of acute stress after her husband's death. He also planned to start Zoloft to target depressive and anxiety symptoms. (Tr. 172-73.) He indicated a GAF of 55. (Tr. 173.)

In her completed Disability Report Form SSA-3368, Plaintiff described her past work as a Home Health Care Companion, indicating that she used no machines, tools, or equipment and no technical knowledge or skills. She also indicated that the heaviest weight she lifted, and most weight she frequently lifted was less than 10 lbs. (Tr. 58-60.)

2.     Relevant hearing testimony

On January 15, 2005, a hearing was held before the Administrative Law Judge (ALJ) Melvin Rosenberg. Plaintiff was present, along with her attorney, Karl Osterhout, and a vocational expert (VE). (Tr. 182.) Plaintiff testified that she has not worked at anytime since January 14, 2004. (Tr. 187.) In response to questioning by the ALJ regarding jobs she held for more than three months, Plaintiff testified that she worked as a home health aide. (Tr. 188-89.) Plaintiff testified as follows concerning details of this employment:

> Q.   As a home health aide, were you primarily on your feet, ma'am?
>
> A.   Yes.
> Q.   And up to how many pounds did you lift on that job, ma'am?
> A.   About –
> Q.   150 pounds? Yes? Okay. Have you worked at any other jobs in you

        lifetime for more than three months?
        A.      Same type of work.

                 . . .

        Q.      Ms. Williams, I don't want to keep on hammering at this one issue with you, ma'am, but you worked as a housekeeper or janitor at a couple of jobs over the years.
        A.      Yes.
        Q.      Did either of those jobs last more than three months?
        A.      A couple of months, three or four.
        Q.      Which job was that?
        A.      I can't remember anything.
        Q.      Okay. When you worked as a home – as a housekeeper or janitor, were you primarily on your feet, ma'am?
        A.      Yes.
        Q.      And up to how many pounds did you lift?
        A.      About 30 or 40, something like that.
        Q.      All right.

(Tr. 189-190.)

        Upon examination by her counsel, Plaintiff testified regarding the symptoms of her depression. She indicated that between four to five days a week, she feels weak and can't get out of bed. (Tr. 197.) She described her depression as lasting for days at a time. (Tr. 197-98.)

        Finally, Plaintiff's counsel argued to the ALJ that evidence of Plaintiff's disabling mental limitations is found in the redacted documents from Western Psychiatric Institute. (Tr. 201-02.) The ALJ expressed concern regarding the redacted contents of the documents and indicated that he would "accept a . . . certified statement from the mental health organization that says that the only material that's blacked out had to do with other people and nothing to do with the claimant." (Tr. 207.) The ALJ concluded that Plaintiff and her counsel had 30 days to provide additional evidence, and suggested that an actual evaluation from Dr. Thompson as Plaintiff's psychiatrist would be helpful and/or unredacted versions of the redacted documents.

(Tr. 208.)

On December 28, 2005, the ALJ issued his decision and found that Plaintiff is not disabled within the meaning of the Social Security Act. (Tr. 14-18.) In this brief five page decision, the ALJ specifically stated at page 2 the following:

> The claimant has the following severe impairments;[sic] drug addition[sic] and borderline personality disorder, a left ankle injury, and optic neuritis. She also has multiple sclerosis, but that happens to be a <u>non</u>-severe impairment in her case.

(Tr. 15) (emphasis in original). Later, in the Findings section of the decision, the ALJ states at Finding No. 5 that "[T]he claimant has the following residual functional capacity: the claimant can perform work at any exertional level. She mentally has no limitations." (Tr. 18, Finding No. 5.)

B.     <u>Standard of Review</u>

The standard of judicial review is whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson</u>, 402 U.S. at 401; <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999) (quoting <u>Pierce v. Underwood</u>, 487 U.S. 552 (1988)); <u>Smith</u>, 637 F.2d at 970; <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 406 (3d Cir. 1979). "Substantial evidence" is more than a "scintilla." <u>Jesurum v. Secretary of United States Dep't of Health and Human Servs.</u>, 48 F.3d 114, 117 (3d Cir. 1995); <u>Stunkard v. Secretary of Health and Human Servs.</u>, 841 F.2d 57, 59 (3d Cir. 1988); <u>Smith</u>, 637

F.2d at 970.  If supported by substantial evidence, the Commissioner's decision must be affirmed.

The Supreme Court has described a five-part test established by the Commissioner to determine whether a person is disabled: The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work.  See 20 C.F.R. §§ 416.920(a) through (c) (1989).  In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work.  See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A) (1989).  If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry.  § 416.920(d).  If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps.  At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience.  If the claimant cannot do his past work or other work, he qualifies for benefits.  §§ 416.920(e) and (f).  Sullivan v. Zebley, 493 U.S. 521, 525-26 (1990).  Accord Barnhart v. Thomas, 124 S. Ct. 376, 379-80 (2003).  The initial burden rests with Plaintiff to demonstrate that he is unable to engage in his past work.  Stunkard, 841 F.2d at 59; Cotter v. Harris, 642 F.2d 700 (3d Cir. 1981); Dobrowolsky, 606 F.2d at 406; Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979).  The burden then shifts to the Commissioner to show that other work exists in the national economy that he could perform.  Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984).   The fifth step is divided into two parts:

> First, the [Commissioner] must assess each claimant's present job qualifications.  The regulations direct the [Commissioner] to

> consider the factors Congress has identified as relevant: physical ability, age, education, and work experience. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f) (1982). Second, [he] must consider whether jobs exist in the national economy that a person having the claimant's qualifications could perform. 20 C.F.R. §§ 404.1520(f), 404.1566-404.1569 (1982).

Heckler v. Campbell, 461 U.S. 458, 460-61 (1983) (footnotes omitted).

    C.    <u>Discussion</u>

Plaintiff argues that the Commissioner's determination that she is not disabled is not supported by substantial evidence for the following reason: The ALJ made internally inconsistent findings; specifically, that Plaintiff's personality disorder was a "severe impairment" in the body of his decision, on the one hand, but then concluded at Finding No. 5 that Plaintiff had "no limitations" from a mental health standpoint. (Plaintiff's Brief in Support of Motion for Summary Judgment, Doc. No. 12 at 7.) Defendant argues that despite the inconsistency, this Court may still conduct a meaningful review of the ALJ's decision in light of "the body of the ALJ's decision that discusses how he concluded that Plaintiff has moderate mental limitations and can perform her past relevant work." (Defendant's Brief in Support of her Motion for Summary Judgment, Doc. No. 14 at 5-6.) Specifically, Defendant directs this Court to the following language contained within the body of the ALJ's decision:

> Mentally, Dr. Haddad assessed the claimant has only mild to moderate impairment in all work related activities, and indeed is mentally able to work (Exhibit 5f/5). A late file document from UPMC Western Psychiatric Institute also shows a treating source, Dr. Marvin, has arrived at a similar assessment, finding the claimant has a Global Assessment of Functioning of 55 (Exhibit 13F/4).
> . . .
> Pursuant to the assessments noted above it is quite clear that mentally the claimant can work.

(Tr. 17.)  Defendant's argument concludes that the above language, "and not the ALJ's misstated finding, reflects the basis of the ALJ's conclusions because it provides a detailed rationale that the Court can meaningfully review."  (Defendant's Brief in Support of her Motion for Summary Judgment, Doc. No. 14 at -6.)

A careful reading of the language relied upon by Defendant and the report by Dr. Haddad referenced therein, reveals that Dr. Haddad assessed Plaintiff's mental impairments relating to work related activities from mild to moderate.  Yet, Finding No. 5 states that mentally, Plaintiff has no limitations.

In Securities and Exchange Commission v. Chenery Corp., the United States Supreme Court set forth the following fundamental rule of administrative law:

> [A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.  To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.
> We also emphasized in our prior decision an important corollary of the foregoing rule.  If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.  It will not do for a court to be compelled to guess at the theory underlying the agency's action . . ..

332 U.S. 194, 196-97 (1947) (emphasis added).

The inconsistency in the ALJ decision's here, as well as other vague and incomplete analyses, prevent this Court from undertaking a meaningful review as required by § 405 (g).  Consequently, this Court should remand this case to the Commissioner for a more comprehensive and consistent analysis of the evidence pursuant to the requirements of applicable

regulations and the law of this Circuit, as discussed in more detail below.

First, as noted above, the ALJ identifies drug addiction, and borderline personality disorder as severe impairments. (Tr. 15.) Thereafter, in his narrative description of the medical evidence of record, he discusses Dr. Haddad's opinion that, inter alia, Plaintiff would have slight impairment in making work-related judgments, and interacting with coworkers and supervisors, and moderate impairment in interacting with the public. The ALJ also described the findings of Dr. Tarter who indicated that Plaintiff's described symptoms and limitations were consistent with mild limitation in activities of daily living and moderate limitation in social functioning and in concentration, persistence or pace. (Tr. 16.) Thereafter, the ALJ again notes in the body of his decision that in the context that Plaintiff "is a drug addict who has a personality disorder[,]" "[m]entally, Dr. Haddad assessed the claimant has only mild to moderate impairment in all work related activities, and indeed is mentally able to work." (Tr. 17.) Yet, at Finding No. 5, the ALJ states that "[t]he claimant has the following residual functional capacity: the claimant can perform work at any exertional level. She mentally has no limitations." (Tr. 18, Finding No. 5) (emphasis added). Clearly, the body of the ALJ's decision and his finding that mentally, Plaintiff "has no limitations" are inherently inconsistent. As a result, this Court can only speculate as to what the ALJ meant by this inconsistent language, which is prohibited by Chenery. See Chenery, 332 U.S. at 196-97. Moreover, this inconsistency taints the ALJ's residual functional capacity assessment required at the beginning of Step 4 of the five-step sequential evaluation.[3] Necessarily, the ALJ's entire analysis at Step 4 is suspect

---

[3]"Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Hartranft v. Apfel, 181 F.3d 358, 359 n.1 (3d Cir. 1999) (emphasis added).

and should be reconsidered. See generally SSR 96-8p (Residual Functional Capacity in Initial Claims); SSR 82-62 (A Disability Claimant's Capacity to do Past Relevant Work).

Relatedly, it is unclear from the ALJ's decision whether he weighed the evidence relating to Plaintiff's diagnoses of depression, or simply disregarded it because of his conclusion that Plaintiff "is a drug addict" in light of Congress' 1996 amendment to the Social Security Act to preclude an award of benefits where drug addiction is a contributing factor material to the determination of disability.[4] That is, the ALJ's decision does not reflect that he weighed the medical evidence relating to Plaintiff's depression at all, including those reports generated by her treating physicians. See Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000) (remand appropriate where ALJ "fail[ed] to consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination.").

Likewise, the ALJ's decision does not reflect that he considered, discussed and weighed the medical evidence from Plaintiff's treating physicians that her crack cocaine dependence was in sustained remission. See Podedworny v. Harris, 745 F.2d 210 (3d Cir. 1984) (where ALJ failed to explain why he rejected evidence, remand necessary "for a more thorough consideration" of evidence); Wier v. Heckler, 734 F.2d 955 (3d Cir. 1984) (remand required where ALJ failed to explain or acknowledge medical opinions that conflicted with his own conclusion and opinion of another doctor).

Instead, the ALJ concludes, without consideration and analysis of Plaintiff's

---

[4] See Contract with America Advancement Act of 1996, Pub. L. No. 104-21, § 105, 110 Stat. 847 (1996), amending 42 U.S.C. §§ 423 (d) (2), 1382c (a) (3).

treating physician reports, that Plaintiff is a drug addict. Thereafter, he does not engage in the required analysis as to whether his conclusion regarding Plaintiff's drug addiction is a contributing factor material to the determination of disability. That is, under the Social Security Administration's regulations, the "key factor" in determining whether a claimant's alcohol or drug abuse is a material contributing factor to the claimant's disability is "whether we would still find [the claimant] disabled if [he or she] stopped using drugs or alcohol." 20 C.F.R. § 416.935(b)(1). The ALJ is to determine which of the claimant's physical and mental limitations would remain if the claimant stopped using drugs or alcohol, and then must determine whether any of the claimant's remaining limitations would be disabling. 20 C.F.R. § 416.935(b)(2). If the ALJ determines that the remaining limitations would not be disabling, the ALJ must find that the claimant's "drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 416.935(b)(2)(I). If the ALJ determines that the remaining limitations would be disabling, however, the ALJ must conclude that the claimant is "disabled independent of [his or her] drug addiction or alcoholism and ... [his or her] drug addiction or alcoholism is not a contributing factor material to the determination of disability." 20 C.F.R. § 416.935(b)(2)(ii). The ALJ's decision does not reflect that he engaged in this analysis. Clearly, this issue must be clarified on remand as required by the regulations.

   At best, the ALJ's decision in this matter is inconsistent and vague for the reasons noted above. Remand is necessary for a more comprehensive and consistent evaluation of all the evidence of record. Only then will a meaningful review be possible pursuant to 42 U.S.C. § 405 (g).

III. CONCLUSION

It is recommended that the Motion for Summary Judgment filed by Plaintiff at Docket No. 11 be granted, and that the case be remanded to the Commissioner for further proceedings as described in this Report and Recommendation. It is also recommended that the Defendant's Motion for Summary Judgment at Doc. No. 13 be denied.

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this Report and Recommendation. Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

LISA PUPO LENIHAN
United States Magistrate Judge

Dated : April 23, 2007

cc: The Honorable David S. Cercone
United States District Judge

All counsel of record